Good morning to all of you. Mark Lauzo for appellants in both cases. I'd like to reserve one minute for rebuttal if my time permits. And I'd like to start with the Baker case, though what I'm going to say really applies to both cases. The primary issue I'd like to start with is in regard to the application of the litigation privilege, which is of paramount importance in both cases. My argument will focus on why leave to amend should have been granted by the district court, which this court reviews de novo. The first main point is that the complaint, at minimum, can be amended to allege a claim for abuse of process, which is not subject to the litigation privilege. Case law is clear about that. To support an amendment, you need two things. You need an ulterior purpose that is different from the purpose of actually resolving the underlying litigation. And you need a willful act in furtherance of that purpose that is not in the regular course of the proceeding. Here, we have both. The ulterior purpose, as alleged or as we can allege in an amended complaint, is that the receivership proceeding was filed in order for Dean Meiling and his companies to unlawfully acquire the trademarks of M.I. Inc. through the credit bid sale of M.I. LLC's assets. In order to succeed on an abuse of process argument, do you have to show that the receivership proceeding was itself incorrect or that there was something wrong with the receivership proceeding? You just have to show an ulterior purpose, Your Honor, something other than resolving the receivership proceeding, which would have been — Clients and lawyers often have ulterior purposes. That is to say, the law gives you right X based upon such and such. Well, I'm happy to take advantage of what the law says, but actually, what I really want is something else and for a different reason. But I'm forced to do what the law allows me, or I can only enforce what the law allows. I mean, litigants have ulterior purposes all the time. Absolutely, Your Honor. But if the ulterior purpose is unlawful, in this case, the surreptitious acquisition of M.I. Inc.'s trademarks through the M.I. LLC credit bid sale, that's what defines an ulterior purpose, and that's what we can allege here. And we have the proof for that. There were two willful acts committed in furtherance of that purpose. One was the credit bid sale itself, which we allege was rigged, which served — That one — that one sounds like you're up against Rooker Feldman. Pardon? That sounds like you're up against Rooker Feldman on that one. Potentially, Your Honor. But the difference there is that there were actually two acts. There was the credit bid sale, and there was the fraudulent filing of the USPTO application with a doctored Exhibit B that listed the trademarks, some of which were not even in existence at the time. When you have those acts coupled together, you are outside the ambit of the litigation privilege, and you are abusing process. At least that can be artfully alleged in an amended complaint. Those are the only two elements you need for an abusive process claim. If you apply the litigation — Is there a case that says that the litigation privilege doesn't apply to an abusive process claim? Yes, absolutely, Your Honor. That's the Taylor v. Sullivan case, which we most prominently cited in our briefing, which was actually published after both of the underlying complaints were filed. In that case, the Court held that the litigation privilege does not apply to the tort of abusive process because abusive process is concerned with an underlying motive, i.e., an ulterior purpose, rather than communications made in furtherance of the litigation. So an improper motive removes an otherwise privileged communication or a privileged proceeding from the ambit of the litigation privilege. This actually raises the import of Magistrate Baldwin's February 23, 2021, ruling in the Camion v. Metalass Matter, which is also before Your Honors this morning. Before we get there, why is this argument not waived? I don't think you mentioned abusive process at all to the District Court. In our underlying motion... In seeking to leave to amend. We did actually ask for leave to amend. I can't tell you... Yes, but you didn't mention abusive process. I don't know if we mentioned abusive process in that argument, Your Honor. There was no hearing on the merits. There was just briefing. We filed one opposition. We said this can be amended. We did not know that the litigation privilege was going to be the subject of the District Court's order. But an abusive process claim is easily had here because even if you're under the litigation privilege, the abusive process claim removes it from that clause. And that's actually the primary argument is we don't even get to the litigation privilege here because Judge Du's interpretation of the litigation privilege is actually, number one, it's contrary to her ruling in the Allstate v. Belsky case that we cited in which she argued that the conduct alleged here would not serve the purpose of promoting those involved in judicial proceedings to speak freely. To the contrary, it would encourage the fabrication of evidence in an attempt to leverage settlement and fabrication of evidence is unsurprisingly not entitled to protection. That's exactly what we have here or what we can allege here with the fraudulent USPTO filing is the doctoring of an exhibit attached to that application that listed trademarks to which appellants knew they were not entitled. Pardon me, appellees knew they were not entitled. That's also what the Freedom Mortgage and Dickerson courts emphasized in that in determining whether the litigation of privilege applies, it is important to assess, quote, whether the gravamen of a complaint is based on nonprivileged actions rather than potentially privileged communications. This question is particularly civic — significant here, and this is why we don't even get to the litigation of privilege, because the district court misconstrued the allegations comprising the fraudulent scheme to include communications rather than a course of conduct. A course of conduct is not subject to the litigation of privilege, and this is really where the district court missed the mark. So I guess that was my problem. What is the fraud you're actually alleging? Isn't it — I thought it's the sale of the assets from the company to the Mellings. The credit bid sale, Your Honor, was the consummation of the receivership proceeding. That's all that was. So why isn't that not part of the litigation of the receivership? That can be part of litigation of privilege if it's construed to have occurred not for an ulterior purpose. It can be. We contend it was for an ulterior purpose. However — That's if you're — if that's assuming we're an abusive process claim, right? If it's under just a regular fraud claim, then it is part of the litigation of privilege. We would argue it is not, Your Honor, because it is part of a course of conduct. It is not a communication in furtherance of the litigation. And that actually emphasizes my point about how there was an entire course of conduct that occurred even before the receivership proceeding was filed. That is really what comprised the gravamen of the fraudulent scheme claim. But the fact that it occurred before the litigation was filed, that is not in itself enough to take you outside of litigation of privilege. Correct, Your Honor. If there is an anticipation of litigation, that's right. And what's the difference between course of conduct and lots of communication during the period in which you're talking about course of conduct? Excellent question. What do you mean by conduct? Excellent question. It was actually — it's been rarely defined as far as our research is concerned. But communications, as far as what we've seen, are communications to the court, something that's spoken, something that's written in furtherance of a litigation, in furtherance of a legal proceeding. A course of conduct are acts taken that are outside the ambit of the litigation privilege. Here, what do we have in terms of a course of conduct? We have the appellees fading, negotiating, and finalizing the terms of a new funding arrangement with the MILLC entity, which involved actively concealing the professional capacities of appellees Janet Chubb and James Proctor. We have that under those false pretenses, they obtain access to MILLC's private financial records and then use that to take over the company. Help me understand when you say actively concealing the, I guess, the capacities in which they're acting, Chubb and Proctor? What do you mean by that? I mean, James Proctor ended up being the court-appointed receiver here. He was introduced to David Simas, the owner of MILLC and MI Inc., as Dean Miling, one of the investor's accountants. He was never introduced as someone who could potentially serve as a receiver. Was he, in fact, the accountant? That we don't know. That's how he was introduced, is the accountant. And this was out of — Well, if you don't know, then you can't allege fraud. You just don't know. Well, we can't — He might well have been the accountant. We can absolutely allege misrepresentation because Mr. Proctor should have said, I am in the line, I'm in the running here to be a court-appointed receiver for this case. I can have no financial interest in this case. I can't certainly be an advocate for Dean Miling. I can't be looking at these records beforehand. I can't then use these records to surreptitiously appoint myself as receiver, which, by the way, happened in an ex-party proceeding without any notice to anyone. Again, that sounds like Rooker Feldman. That may very well be, Your Honor. But it is part of the course of conduct that occurred pre-litigation. It is part of the fraud. It is part of something that was outside the ambit of a communication to the court in furtherance of a litigation purpose. It is in furtherance of an ulterior purpose. It was an act in furtherance of something other than resolving that litigation, which ended up being a receivership proceeding. Even if you take that as true, but everything else that Proctor did after that would seem to be in the course of litigation or part of the receivership, right? So all you get is that one statement that I'm an accountant? No, Your Honor. We have more than that. We have that statement that I'm an accountant. We have the acquisition of private financial records. And to reiterate, when you say that statement, I'm an accountant, you don't know whether that's true or false. We don't know. But what we do know is if he really was an accountant, he should never have been appointed as the receiver by the court because he would have already been an advocate for one of the parties. A receiver, by definition, is not an interested party. He has to be neutral. And that's the difference. Other acts that occurred, the filing of the fraudulent USPTO application, which contained the doctored Exhibit B. Oh, Proctor wasn't involved in that. Correct. Correct. That involvement was by someone in Jan Chubb's office. Did you ever make any objection during the receivership process to Proctor on the ground that he was the accountant for one of the parties? We didn't know about it, Your Honor. There's only one person who knew about that receivership proceeding, and that was Mark Harris. No one else got notice of the receivership proceeding. No one got notice of the credit bids sale. No one had the chance to object. This all happened after the fact. Did the court hold the otherwise, that there was a notice provided to everyone? I don't believe so. I forget which case it was, but I thought the district court in one of the cases said that there was notice. There was confusion on the district court's part. The district court parsed allegations. We alleged that the notice was never served. The district court said that that's not the same as alleging that it wasn't received, that that's somehow inconsistent. By alleging that it was never served, we necessarily allege we didn't receive it. Nevertheless, if that's a confusing allegation, it can easily be remedied in an amended complaint. But the point is we did not get notice. No one got notice but for Mark Harris. So consummation of the acts, the USPTO filing the credit bid sale itself, which, again, had the ulterior purpose of unlawfully acquiring the trademarks of MI, Inc., which is the only thing that Dean Meiling ever had a collateralized interest in. This is why there wasn't a litigation privilege communication alleged, a course of conduct that the district court did not recognize. And in a knee-jerk reaction fashion, the district court applied the litigation privilege as a blanket prohibition over the entire complaint because some of the allegations discussed the receivership action. That's not what the law holds. The law holds that if the gravamen of the complaint alleges a course of conduct, you are outside the ambit of the privilege. Assuming you make multiple allegations, some of them are subject to litigation privilege, some of them are not, do you just strike out the allegations that are part of the privilege? I think that's exactly what you do. And then so if we did that, is there—that's my problem with this. It seems like all you have for a proctor, at least, is the statement that I'm an accountant. You have the statement that I'm an accountant. You have the unlawful access into the private financial information of MILLC, which he would not have otherwise had access to had he not represented that he was Dean Meiling's accountant at this meeting. And then you have all the acts that occurred during the receivership proceeding. What we will allege is that Dean Meiling— You can't use any of that, though. I disagree with that, Your Honor, and here's why. Dean Meiling was running the company during the entirety of the receivership proceeding. The receiver, James Proctor, was not. We have e-mails to that effect. Dean Meiling is telling Mr. Proctor what to do. That is not a litigation-privileged conduct. That is outside of litigation privilege. It's not a communication in furtherance of some purpose of the litigation. He's running the company. He's hiring and firing employees. He's negotiating contracts. He's canceling contracts. And then ultimately the consummation of this is that there's a two-person meeting at the Metalast offices. Dean Meiling and James Proctor are the only ones there where this credit-bid sale occurs. Why was no one else there? Because no one else got notice. And it wasn't even a full credit-bid sale. It was a partial credit-bid sale. He took back part of his debt so he could then pursue David Seamus, the owner, in bankruptcy for the other part. That is how we acquired the company. That is also why there was irregularity in both the USPTO filing and the credit-bid sale. The irregularity of the filing was that it had a doctored list of trademarks. The irregularity of the sale was that it wasn't marketed to anyone, including the trade partners of Metalast, who would have paid upwards of millions of dollars for the company. Nobody was notified of the sale. There was no appraiser hired to value the company. I think we're back into Rooker-Feldman territory. It's not that broad, Your Honor. You can't get away with all of this unlawful conduct and just say you're under the Rooker-Feldman document or under the litigation. But everything you're saying in the last couple of minutes goes to that this receivership was improperly conducted. The receivership itself we don't have a tremendous issue with, but for the fact that it ended with a consummation of the credit-bid sale that unlawfully transferred the trademarks of M.I. Inc. to Dean Meiling and his companies, that's what's wrong with the sale. But that sounds like you're attacking, then, the result of the receivership. I'm sorry? That sounds to me, then, as though you're attacking the result of the receivership. We are attacking the result of the receivership. And I don't think a district court, a Federal court, has authority to upset effectively on appeal from a State court proceeding. The difference here, Your Honor, the stark difference is what the line of cases that we cited hold, which states that if there is a course of conduct that is alleged in the complaint that is aside from the litigation communication or the consummation of a litigation-protected communication, you're not within the ambit of the privilege. Otherwise, you could do whatever you want during a lawsuit or in anticipation of a lawsuit, something that's potentially civilly or even criminally liable and get away with it. But I'm not sure you're responding to my point. You were arguing, and at what point I interjected, you were arguing that the receivership was being conducted improperly and that the sale was wrongful. I don't think we have any jurisdiction to consider that. I don't disagree with that, Your Honor. But the misrepresentations by James Proctor, the acquisition of the trademarks, which was really part of our conversion claim, all of that was aside from the actual process of the receivership action and ultimately the credit bid sale. We are not attacking anything that the state court ruled on. We are attacking a course of conduct, a fraudulent scheme as alleged in the complaint which came up upon that. I'd like to use just a few minutes to discuss the other main issue, unless there are questions about that. In regard to the question, is there any difference between Baker and Alexander on the litigation privilege argument? Not really. Do they fall together? Yes, basically, Your Honor. But there is a difference in regard to the statute of limitations. Yes, that's right. And that really dovetails into what the district court arbitrarily selected as the trigger date, which was the sale, the credit bid sale. And, again, we allege that that's irrelevant because we never got notice of the sale. There is nothing about the sale that could have triggered any kind of knowledge on our part to conduct any kind of investigation. If there was some kind of duty to take constructive notice of something and start investigation, that really is a question of fact for the trier of fact. And it's not proper at a pleading stage to dismiss a complaint, so says this circuit and lots of case law, based on allegations that judge do. Did the district court make that finding? I think she took judicial notice of the actual notice. Of the credit bid sale, actually. She used the contents of the credit bid sale to actually refute the allegations that we had about our discovery of the fraudulent scheme. And that really is what not only does that run afoul of longstanding Nevada law that states a continuing course of conduct tolls the statute of limitations. Can I ask before you run out of time, what was so key about the Proctor email, I think, in March of, I forget what year. March 2017. Yeah, what was the key about that email that let everyone know about the fraud? It actually wasn't key. I think that that's what was a huge misinterpretation on the part of the district court. All that email told us was that there was a February 22nd ruling by Magistrate Cook in which she ruled that Mr. Proctor was not immune from liability under the doctrine of judicial immunity. So on March 4th, some of us, a small minority of the 51 named plaintiffs, received notice of the February 22nd ruling. At the same time, they said, oh, by the way, Mr. Proctor was deposed in this other case, and he produced documents in this other case. That's all we were told, is he was deposed and he produced documents in this other case. So why did that trigger the discovery rule at that point? That's our whole point. It did not trigger the discovery rule. It took several months for us to get our hands on those documents, look at them, and find really what was a needle in a haystack in the Bruce Leslie email exchange, which told us that Dean Meiling was told that he knew he did not own the trademarks owned by MI, Inc. That was the whole point. Then we started putting the pieces of the puzzle together and came up with a fraudulent scheme. That did not occur until well into 2018. The complaint was timely under a two-year analysis. It was timely under a four-year analysis, which governs civil conspiracy, and Judge Due erred in dismissing it on timeliness grounds. I just want to get back to what Your Honor mentioned about why this could be an improper attack on a – we have to emphasize the course of conduct outside of the receivership proceeding. That is really the gravamen of what gave rise to the fraudulent scheme. That is why we are outside the ambit of the privilege, and that's why we don't even get to the privilege because we're dealing with conduct, not communications. If you want to wrap up, since you – Sure. I'll give you a minute on rebuttal if you'd like. Thank you, Your Honor. I'll go ahead and do that. Thank you. May it please the Court. Adam Hosmer-Henreth, McDonnell-Carano for the Miling Appellees. I intend to use 13 minutes of my time today and share the remaining with my colleague, Mr. Pancari, who will be arguing for the remainder of the appellees. As a result of the final order in the state court receivership proceedings, all of the assets of Metalast International LLC were sold via a credit bid sale. That is the latest date at which any harm could have accrued, any wrongful act could have accrued that would have affected any of the investor appellants in this case. That harm only occurred as a result of the state court receivership action and the approval of a Nevada state court judge, who not only blessed that receivership proceeding, blessed the credit sale, but affirmatively found that notice was provided to the investors of the LLC, that an opportunity to object was provided, and only as a result of his order and that sale could the investors have any cause of action. Thus, whether it's called a fraudulent scheme or a civil conspiracy, Metalastgate, any other term, any other action put out there, the only culmination of that harm could result through the state court proceedings. What we have is not a first attempt, not a first bite of the apple. There are two consolidated appeals today, but there are actually three successive class actions that were all filed years after the initial state court receivership action. Not one appeal, not one challenge to the state court receivership action was ever filed in state court by anyone in any of the three classes. The first class action was filed in October 2016. That was the Alexander action. That was filed in the federal court in the District of Nevada and dismissed pursuant to litigation privilege, and that's obviously one of the cases we're discussing today. The second one was filed in 2019 in Orange County, California, then removed and then transferred to the District of Nevada. It was dismissed pursuant to the statute of limitations, and that was not appealed. And then the third case was filed in 2020 in California State Court in Los Angeles, removed, transferred to the District of Nevada, and dismissed for both the litigation privilege and the statute of limitations. This series of vexatious and frivolous actions has resulted in multiple district court judges deeming the actions to be frivolous and implausible. Have you argued preclusion on the statute of limitations question based on the decision on the first suit and the failure to appeal? It is tough to argue preclusion on a target that shifts this much, Your Honor. I guess the answer is no. We have argued. We have not argued preclusion from the Harris Court dismissal. That's correct. But the arguments there are so different than what were pleaded in Baker, the third case. And what you heard was the June or March 2017 email about Proctor didn't trigger the discovery limit period, but that's exactly what they argued in the complaint and that's exactly what they argued in the appellate briefs. So the question that you asked, Judge Bumate, was what's so special about that email? They said that the earliest, upon information and belief, the earliest they could have possibly discovered this fraudulent scheme was in that March 2017 email, which then led them to dig up additional documents. Plausibility is central to this case. They're alleging, these investors, that they could have only discovered the fraudulent scheme after February or March 2017. And yet the Alexander action, alleging the same fraudulent scheme, which multiple district judges have found allege basically the same allegations. They sued Proctor as well in that for his role. That was filed in October 2016. It is very, very difficult to respond to all of these arguments and treat them as remotely credible when the allegations are so self-defeating, so frivolous, and frankly not credible at all, that we're struggling to hit a moving target, but we've done so successfully three times in a row. I'm sorry. How do you respond to your friend's argument that the district court was wrong, that the investors had notice of the sale, the receivership sale? In many, many ways, Your Honor. Apologies, but that is difficult to hear at this stage when the complainant, Alexander, alleges as a ground for fraud that the status report filed by the receiver, Proctor, in June 2013 was received by the investors and was a basis for their fraudulent claim. The third class definition excludes Mark Harris because, in part, in the Harris litigation, the statute of limitations was triggered because he showed up as an investor and made an objection. So rather than respond to the fact that that clearly demonstrated at least some notice was sent out, their response was to exclude him from the class definition and try to find new plaintiffs of this investor class who they can allege plausibly never received notice. The state court receivership found that notice was provided of both the petition and the October 2013 notices of sale, that that was circulated on a reasonable basis to the investors. There was a 30-page list of addresses that that notice went to. We know some of the investors actually showed up. Some made objections. And then a complaint was filed in 2016, clearly being aware of these issues.  Because that was a public filing done where the management of the company was replaced. And they locked them out, essentially, and then the receiver took over operations of the company. To then imply that no one had noticed, including the management of the company, who presumably would have been a member of this class as well, is simply implausible. In addition, what the district court found was that as a result of the public filings, she agreed with us in the Baker case and said that the public filing of that receivership should have constituted inquiry notice. And we don't have any other triggering date as to when investors learned of anything, because they keep changing their minds about when they could have possibly learned about something. They were on notice of the credit bid sale in 2013, as well as the order and the petition noticing the hearings. There was a public hearing. People appeared. Is it also part of Nevada law to provide notice when a sale happens like that? Absolutely. There are reasonable bases. There were over 900 investors, and so they had to rely upon the documents that the company had in order to notify the investors. So obviously, perfect notice can't be required because it's limited by the records of the entity. But what we have, at least on the record, is certainly the notice going to 30 pages in the state court receivership proceeding and some people appearing. But I think the Alexander allegation is critical from 2016 that there was a status report, multiple status reports filed by the receiver, that then was received by the plaintiffs in Alexander and used as a basis to affirmatively allege fraud. Before too much of my time elapses, I do want to turn to the litigation privilege. Before you do that, sorry, the Alexander District Court did not rule on statute of limitations ground. Am I correct on that? That's correct, although the statute of limitations was raised in that case. So can we reach it on appeal, or should we have to kick that back to the district? We believe you can reach it on appeal. It's adequately supported by the record. The complaint was filed in October 2016, which would be more than three years after the receivership proceeding was initiated. And actually, getting back to Alexander, in the course of the jurisdiction arguments that were raised in Alexander about potentially a Rooker-Feldman challenge, etc., the plaintiffs shifted their position again and said, no, no, we're only talking about pre-litigation conduct, and all of our actions are related to what happened before the receivership was initiated. If that's true, then the statute of limitations would even have expired earlier. And so we think the three-year statute of limitations for most of those claims, I think that takes care of everything, but a breach of contract claim, which they've essentially backed off of quite significantly, would be barred by the statute of limitations in Alexander. But certainly the litigation privilege applies with equal force to both proceedings. And the litigation privilege was repeatedly misstated by opposing counsel. In Nevada, it's extremely broad, and it does include the tort of an abusive process. That's clear in California under the PG&E case, where California said it is one of the broadest privileges we have and applies to every cause of action but for malicious prosecution, including the abusive process. The case they rely on. And again, they rely on this because once the case was dismissed, they found a new cause of action that wouldn't be dismissed pursuant to the grounds the district court did raise and did consider. And their new cause of action was apparently abusive process, which would be subject to a limitations period anyway. Can't identify a wrongful act outside the course of the litigation proceedings. But on the litigation privilege itself, that's one district court decision that's currently on appeal from Judge Jones that mentions in dicta that there's some tension between the abusive process in that case and the litigation privilege. Chief Judge Due has found the litigation privilege applies to abusive process on at least one occasion. And the weight of authority, the overwhelming weight of authority applies the litigation privilege to the tort of the abusive process because without that tort, without the protection of that tort, you could spawn an unlimited number of derivative actions from exactly what... from any civil litigation, which is exactly what the litigation privilege is intended to protect against. And on the litigation privilege, this discussion about the gravamen is important because there is somewhat of a tension between the abusive process tort and the litigation privilege. Otherwise, everything in the litigation world would be protected by the privilege and not subject to the abusive process claims. But what the case law indicates is that there are clear exceptions where it's so far outside of what the normal course of judicial proceedings are that the abuse of process... that the litigation privilege would not apply. Examples of that include the Dickerson case where there was an attempt to pay an expert outside of the course of the case less than what he was owed, attorney malpractice, attorney malfeasance, bar discipline matters, or a situation that was cited in the Allstate case where there was a discussion about inflated medical billing records. Those are cases where the litigation privilege may not apply and certainly should not apply in certain of those cases because otherwise an attorney would always be able to defend their actions. But in this case, every single action that they complain of is not only central to the receivership action. The receivership action could not have taken place without it. Each of this course of conduct, which is not really a legal standard under the litigation privilege, relates to something that the actors and the defendants in this case took in preparation or directly part of the receivership proceeding. The representations of their counsel. Chief Judge Stu had no problems dismissing this misrepresentation about Janet Chubb because her name appeared on the face of the complaint in the receivership proceeding. Similarly, Jim Proctor, whether he was an accountant or not, he did get appointed by the receiver, so the proper forum to object to that appointment would have been in the state court receivership proceeding and not as a tort years later. But the other conduct, feigning negotiations, feigning the ability to loan additional money, not only was that addressed in the state court receivership proceeding, but those conversations are alleged to be fraudulent in order to trick the... in order to provide confidential information, which was then used to file the receivership. Everything that was done is part and parcel of that receivership action, and, in fact, so core within the litigation privilege that that action couldn't have existed if you took this conduct away. I do want to point out the new sort of arguments about this intellectual property transfer. Those are after-the-fact arguments that weren't presented to Chief Judge Stu really anyway, and they're trying to import the Kimeon order, which we'll discuss later today, into this case. But what they never point out in their constant quest to find some fact on which they can exempt themselves from the litigation privilege is that the investors in Metal Asset International LLC never had any right to that IP, which was only held by MI, Inc. So even if they tack on that new allegation, a new allegation of abuse of process, a new allegation that this IP was somehow diverted or converted by the Mylings, that still doesn't allow this complaint, which only alleges harm to the investors and the LLC, it doesn't provide any sort of grounds to establish that or allow it to proceed. Your Honors, this was a case that they haven't just had one chance to amend. They've had three multiple-class actions and still can't show why their complaint would be anything but futile. They cannot amend their complaint to allege that harm arose from anywhere but the state court receivership proceeding, and they can't change the dates of their complaint to get around the statute of limitations. And with that, I'd like to yield the balance of my time to my colleague, Mr. Pinker. Thank you, Counsel. Good morning, Judge Koehn, Judge Bumate, Judge Fletcher. My name is Oliver Pankeri. I represent the attorney, appellees Janet Chubb, Tiffany Schwartz, and Armstrong Teasdale. I just want to emphasize a few points here, given my limited time. First, let's start with the statute of limitations. Keep in mind that the receivership order approving the sale of the assets of Metal Ass LLC took place in November of 2013. Fast forward to September of 2020. That's when the Baker case is filed. In order to evade the statute of limitations, the Baker appellants allege, and this is the paragraph 44 that's been discussed here a lot regarding this USPTO filing, they allege that upon information and belief, they received an email in March of 2017 relating to a September 2016 deposition and separate litigation of the receiver Proctor with regard to a June 2013 USPTO filing. So connecting all those dots, what they come up with is this fraud allegation that this USPTO filing was fraudulent because it included an Exhibit B, which was certain trademarks belonging to Metal Ass, Inc. Now, the important distinction here is Metal Ass LLC was the investment entity. All of these Baker appellants, all of the Alexander appellants, they invested into Metal Ass LLC. Meanwhile, Metal Ass, Inc. is alleged to have owned these trademarks. And so there are really four problems with this allegation in addition to the fact that I just heard counsel say that this was not the triggering event for the discovery of the statute of limitations. But in addition to that, because the Baker appellants didn't invest in Metal Ass, Inc., they have no standing to assert any claim related to this USPTO filing. And that's set forth on page 8 of their opening brief. They talk about the distinction. They have no ownership in the Metal Ass, Inc. When I hear counsel here today talk about this is a scheme to acquire trademarks belonging to Metal Ass, Inc., the problem with that is that all of these investors just invested in Metal Ass, LLC. They only have standing to talk about Metal Ass, LLC. Further, they don't allege any injury related to that USPTO filing. In fact, in their opening brief, they state that the filing was rejected. In their allegations in the complaint, they say the filing was not acknowledged. Now, if, alternatively, the trademarks did belong to Metal Ass, LLC, they would have been subject to the asset sale. So again, they could not claim any damages from that. So they can't have it both ways. Either the trademarks were part of LLC, subject to the asset sale, or they were part of Inc. and outside of this, and they have no standing to assert any claims relating to this. We pointed that out previously, and that's never been responded to in any of the papers. And so Judge Du was correct when she rejected these allegations regarding the USPTO filing and came back to the very simple aspect of the case. This case was all about damages that allegedly arise from the sale of the assets through the receivership proceeding in November of 2013. The appellants, they try and distance themselves from this now, from the fact that really the grovelment of the entire complaint is what happened in the receivership action and the sale of those assets, but they're bound by their allegations. In Baker, I would refer your honors to ER 780, paragraph 45 of the complaint in Baker, and I'll just read it briefly. With the consummation of this sale, the receiver-defendant's mission was accomplished. The miling defendants took over the company and ownership and control and all profits remained with them to date, to the continuing detriment of the plaintiffs and all class members. In Alexander, the complaint says, the fraudulent scheme culminated with a contrived credit bid sale and the transfer and conversion of a majority of the investment LLC assets to the defendants. This investment LLC was a defined term in the complaint, referencing metal-ass LLC. Thus, the culmination of this alleged fraudulent scheme was the sale of the assets of metal-ass LLC, which took place in November of 2013. Judge Due was, and that all happened seven years before Baker was even filed. The longest statute of limitations with regard to the attorney appellees is three years. So Judge Due was absolutely correct to find that these claims are stale and time-barred. Now, turning back to the litigation privilege, I just want to point out three things. Under Nevada law, in terms of the breadth of the litigation privilege, in Fink v. Oceans, the Nevada Supreme Court explained that the litigation privilege is quite broad. It should be applied liberally. Any doubt about the application of the privilege should be resolved in favor of its application. The litigation privilege applies to non-lawyer statements made in anticipation of litigation. That's the Clark County School District case we cited, too. And the statements need not have, they only need to have some relationship to the proceeding. There's talk in some cases about relevance, and it's not evidentiary relevance. It's just some relationship to the proceedings. That's the Sahara case. Sahara also talks about the policy. Can I ask, what's the dividing line? Your co-counsel mentioned that litigation privilege must give way at some point to an abusive process claim. Otherwise, you're immunizing abusive process claims. So what's the dividing line you want us to draw between when it applies in an abusive process and when it doesn't apply? Well, if the communication is something that is protected by the litigation privilege, then that applies to all claims. I don't think we're conceding that it doesn't apply to abusive process. And one case I'd refer to is Bailey v. City Attorney. That was a Nevada federal case. That was Judge Dorsey. And she talked a little bit about the history of Nevada jurisprudence with regard to the litigation privilege. And she made the statement in that case that if any claim relates to a protected litigation privilege communication, it's subject to the litigation privilege, and it is protected. And so in terms of the distinctions where they're trying to draw some limitations, obviously there's a malpractice exception. That's the Greenberg-Traurig case. That's recognized by the Nevada Supreme Court. Dickerson, an unpublished case, that's where an attorney tried to shortchange an expert and then hide behind the litigation privilege. Under those circumstances, that did not apply. They also cite, too, Freedom Mortgage, which was another Nevada federal case. This is Judge Gordon. For the proposition, they argue that that recognizes attorney malfeasance as an exception. But actually in that case, Judge Gordon found that, and he rejected the Dickerson case, the attorney malfeasance, and found that the litigation privilege actually does apply and cover a slander of title claim. And I see I'm almost out of time. If the Court has any more questions for me, happy to answer them. Thank you very much. Mr. Laza, we'll give you a minute. I'll address as many points as I can, Your Honors. In regard to the Feldman Doctrine, something I forgot to mention, which is actually pretty well briefed, is that we were not parties to that state court proceeding. That only prevents the losing party in a proceeding from seeking federal court redress for a state court action. So you think you get to have us attack the receivers of the proceeding despite Rooker-Feldman? So we have appellate jurisdiction over the Nevada court? You have to be a party to the state court proceeding, Your Honor. The answer to that question is you would not have jurisdiction if we were a party, but we were not a party. That's what the doctrine explicitly says. Also, as the appellees had taken a decision about the in rem versus the in personam, it's been repeatedly briefed by them. These are in personam claims by us. They are not in rem claims against a trust. These are personal claims. They took that decision all the way up to the Nevada Supreme Court, which denied reconsideration en banc. So that issue has been fully briefed. Because they are in person claims, in personam claims, because we were not parties to the state court proceeding, it does not apply. Can I address two more quick things? Thank you, Your Honor. In regard to the receivership action have to take place for all of this to occur, it's absolutely false. There's nothing in Mr. Miling's promissory notes or security instruments that required him to go to court, file for receivership, get a court-appointed receiver who was his disguised accountant, and conduct all of this. That's why you can't give the breadth of litigation privilege that they're espousing here, because otherwise you can use a court proceeding to do anything you want. He could have just foreclosed on his interests. He didn't have to file a lawsuit. He got a court-appointed receiver to try and muck up the record and transfer the trademarks from Inc. to LLC. That was the whole purpose of the receivership proceeding, and that's why it is not protected. Very briefly, Your Honors, Your Honor had asked, did we ask, specifically asked for leave to allege an abusive process claim. You don't really need to do that per the Ninth Circuit. As long as you can allege any viable claim, it doesn't matter what you call it. And we've since come to the point. The district court has to anticipate all the possible claims? The district court cannot deny leave if there is the possibility of alleging a fruitful claim. It doesn't matter what you call it. But do you have to even hint to the district court what you might put in your amended complaint? Had we given a chance to argue, we would have. We were not given a chance to argue.  Yes. Yes, Your Honor. We allege whatever the court feels is deficient, please give us leave and we can remedy these defects in these ways. We did not specifically say we could allege an abusive process claim. But didn't you mention that Taylor came out after the district court? It did. So, I mean, you asked the district court to think of all possible claims and then think of possible defenses to those claims that haven't even been ruled on by any court. Not necessarily. The district court is not imputed with having all the knowledge in the world about what potentially could be alleged. Is that right? The Taylor case is a case decided by Judge Jones. Is that right? I believe so, Your Honor. Yes. Taylor v. Sullivan, yes. Yeah. Two more brief points regarding constructive. Thank you. Constructive notice, Your Honor, they mentioned. Again, that is something to be drawn out in discovery proceedings. The case law is clear about that. If there is some duty of inquiry notice imputed on us through the receipt of this March 2017 email, they can allege that in a dispositive motion. It's improper to dismiss that at the pleading stage. And one more point I had was in regard to the breadth of the litigation privilege. It does not just apply to malpractice claims. The case law is clear about that. The Dickerson v. Brand case discusses that extending the litigation privilege to attorneys who collude with clients to commit malfeasance is inconsistent with the public policy behind the privilege. That's exactly what we've alleged as to the Chubb defendants. It's exactly what we allege as to the Proctor defendants as part of the civil conspiracy. Unless there are questions, I'll rest at this time. Thank you very much. Thank you, Your Honors. Thank you very much for your time. Okay, this case will be submitted.
judges: FLETCHER, BUMATAY, Kane